# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAIGE FAIRBAUGH,

                Plaintiff,

  v.

LIFE INSURANCE COMPANY OF NORTH
AMERICA, d/b/a CIGNA GROUP
INSURANCE,

            Defendant.

3:09-cv-1434(CSH)

## RULING ON CROSS-MOTIONS FOR JUDGMENT
## ON THE ADMINISTRATIVE RECORD

Plaintiff Paige Fairbaugh brings this action against Defendant Life Insurance Company of North America, doing business as CIGNA Group Insurance ("LINA" or "CIGNA"), for violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). Plaintiff, who has Multiple Sclerosis ("MS"), is a participant in an ERISA welfare benefit plan for provision of Long Term Disability ("LTD") benefits ("the Plan") that was issued to Plaintiff's former employer, UBS.[1] The Plan was insured by LINA and LINA administered claims for benefits under the Plan.

In a two count complaint, Plaintiff alleges that LINA violated ERISA in that it terminated her LTD benefits without presenting any medical evidence supporting its decision, disregarded the medical opinions of Plaintiff's treating physician without justification for doing so, and failed to provide a reasonable claims procedure. She seeks to recover benefits under the Plan, to clarify and enforce her present rights under the Plan, and to recover costs and attorney's fees.

---

[1] The company's full name is alternatively given as UBS Warburg and UBS AG One Stamford Forum.

Specifically, Count One for "Enforcement of Plan Terms" seeks a declaration of Plaintiff's entitlement to ongoing LTD benefits, and an award of the unpaid LTD benefits of $5,300 per month back to May 20, 2009, plus pre-judgment interest. Plaintiff also seeks restitution, with pre-judgment interest, for the cost of obtaining medical coverage since May 20, 2009, because disqualification from LTD benefits resulted in Plaintiff's disqualification from continued participation in UBS's medical plan. Count Two seeks attorney's fees and costs under ERISA.

The parties filed cross-motions for Judgment on the Administrative Record. The complete Administrative Record[2] ("AR") was manually filed under seal by Defendant. [Doc. 35] For the reasons stated herein, Plaintiff's Motion for Judgment on the Administrative Record [Doc. 19] is GRANTED, and Defendant's Motion for Judgment on the Administrative Record [Doc. 29] is DENIED.

I.      BACKGROUND

Plaintiff began working for UBS in December 1997. She was diagnosed with Multiple Sclerosis in October 1998. (AR 566) A neurologist, Dr. Joseph Guarnaccia, treated Plaintiff for MS from 2002 onward. (AR 507) Plaintiff's last position at UBS was described alternatively as "Client Events Team Project Leader in the Event Marketing Department" [Doc. 21 at ¶ 2] and "Associate Director, Corporate Event Planner/Project Leader." [Doc. 28 at ¶ 2] Plaintiff maintains that her job as a corporate event planner was highly stressful, required multi-tasking and responsiveness to time-sensitive matters, and involved significant travel, with the physical demands that accompany travel. Defendant disputes this characterization, maintaining that

---

[2] Each page is Bates stamped in the bottom right hand corner with the letters LINA-PF followed by a unique page number between 1 and 970. The Court will designate all references to the Administrative Record [Doc. 35] with the letters AR followed by the relevant page number.

Plaintiff's job was largely sedentary, that any travel was minimal and was within her physical capabilities, and that Plaintiff only began to claim otherwise after her LTD benefits were terminated. The official classification of Plaintiff's job under the Dictionary of Occupational Titles ("DOT") is "light," which by definition involves more physical demands than a job with a "sedentary" classification. (AR 366)

Plaintiff's Receipt of Benefits under the Plan

UBS contracted with LINA to provide long-term disability ("LTD") insurance coverage for UBS's eligible employees under policy number LK0030546 ("LTD Plan" or "Plan"). (AR 236-60) The LTD Plan grants LINA, which acts as the Claims Administrator, the "authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (AR 255) Plaintiff participated in this Plan.

In March 2007, Plaintiff sought short term disability ("STD") benefits, which were also administered by LINA. (AR 364, 566-67) With respect to short term disability, "Disability or Disabled means that you are unable to perform all the material and substantial duties of *your occupation* on an active employment basis because of an Injury or Sickness." (AR 813) (emphasis added). Plaintiff's claim for short term disability benefits was granted, and her STD benefits commenced on April 5, 2007, and were subsequently extended. (AR 785) Plaintiff returned to work full time on or about September 4, 2007, with a work from home accommodation. (AR 750; see also AR 542 ("as she is currently working from the home...")) In May 2008, Plaintiff again sought and was granted short term disability benefits, which commenced on May 17, 2008, and she continued to receive short term disability benefits for six

months, through November 14, 2008.  (AR 290)

Prior to expiration of her short term disability benefits, Plaintiff applied for Long Term

Disability benefits, eligibility for which is defined in the Plan as follows[3]:

An Employee is Disabled if, because of Injury or Sickness;

1. he or she is unable to perform all the material duties of his or her *regular occupation*,
or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her
Indexed Covered Earnings; and

2.  after Disability Benefits have been payable for 24 months, he or she is unable to
perform all the material duties of *any occupation* for which he or she may reasonably
become qualified based on education, training or experience, or solely due to Injury or
Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered
Earnings.

(AR 245) (emphases added).  The period of receipt of short term disability benefits does not

count against the 24 months of long term disability benefits to which an eligible applicant is

entitled under the "regular occupation" standard, before being subject to the "any occupation"

standard.[4]  Thus, Plaintiff's LTD claim was to be evaluated under the "regular occupation"

standard.  On October 28, 2008, Plaintiff was notified that her claim for long term disability

benefits, in the amount of $5,300 monthly[5], had been approved, and that her LTD benefits would

---

[3] Because she earned under $140,000 annually [Doc. 37 at ¶ 9], Plaintiff is a Class 4
employee under the Plan (AR 238), and is subject to the LTD terms quoted herein.

[4] *See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the
Administrative Record [Doc. 27] at fn. 15.  ("Under the terms of the Plan, regular occupation
benefits are payable for the first 24 months of long-term Disability, but the test then changes to
whether a claimant is Disabled from 'any occupation.'  Here, LINA initially approved LTD
benefits in November 2008, so the 'any occupation' benefits test change would not have occurred
until November 2010 if Plaintiff had continued to receive LTD benefits.")

[5] Plaintiff had "bought up" to a more expensive plan that provided more coverage than
the core coverage. (AR 448)

commence on November 15, 2008, the day after her short term disability benefits expired.  (AR 280-81)

Social Security Disability Benefits Denied

The Long Term Disability benefits received by a participant in the Plan are reduced by any Other Income Benefits, including Social Security disability benefits, that are received by the participant.  (AR 250, 280)  Defendant provided Plaintiff assistance in applying for Social Security disability benefits.[6]  (AR 283-86)  On March 11, 2009, the Social Security Administration issued a determination that Plaintiff was "not entitled to disability benefits based on the claim you filed," further stating:

> You said that you are disabled because of multiple sclerosis.  Although you are having some weakness and pain in your legs, you can stand and walk well enough to work. Although you have some problems with fatigue and coordination, you are able to walk and lift and carry small objects.  The medical evidence indicates that your mental health impairments are currently not severe enough and should not prevent you from being able to perform your daily activities and most types of work.

(AR 417)  Plaintiff sought reconsideration of the denial of Social Security disability benefits.

(AR 416)

Termination of Plaintiff's Long Term Disability Benefits

Plaintiff received LTD benefits from November 15, 2008 until she was notified, by letter

---

[6]  Upon approving Plaintiff's LTD claim, Defendant sent Plaintiff a letter stating that "we will agree not to deduct an estimated Social Security benefit prior to your receipt of a Social Security Award" if she, among other things, "cooperate[d]" with Defendant's representatives in applying for Social Security.  (AR 285)  The Second Circuit has observed that "Where the administrator requires a claimant to pursue social security disability to reduce the amount of benefits due under the plan and subsequently determines that the claimant is not entitled to ERISA benefits, the Sixth Circuit has counsel[led] a certain skepticism of a plan administrator's decision-making."  *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 91 (2d Cir. 2009) (citations and internal quotation marks omitted).

dated May 21, 2009, that LINA had terminated her LTD benefits as of May 20, 2009.  (AR 384-

85)  The letter stated the reasons for the termination of Plaintiff's LTD benefits, quoted below:

> We recently completed a review of the information on file.  Specifically, this included:
> –Medical records from Dr. Guarnaccia from July 2008 through May 2009.
> –Neuropsychological (NP) evaluation completed 12/13/07.
>
> Our Nurse Claim Manager reviewed your file and attempted to clarify the clinical rationale for your reported limitations with Dr. Guarnaccia.  Dr. Guarnaccia subsequently sent your May office note documenting an EDSS score now increased to 2.5, and documenting complaints of problems with staring and slight nystagmus.  After review, the Nurse Claim Manager advised that restrictions and limitations to preclude your own Light occupation are not clinically supported.
>
> Although Dr. Guarnaccia feels that you can not perform your prior occupation, he has failed to document a level of severity that supports such limitations. The last NP evaluation on file indicates overall high average to superior level of cognitive abilities. You demonstrated only some subtle to mild deficits, which the examiner indicated that you were able to compensate for in most instances.  We do not have any diagnostic testing demonstrating a progression in your condition.  Your treatment has remained largely unchanged.  Your exam findings are minimal, and largely subjective in nature.

The neuropsychological ("NP") evaluation upon which Defendant relied in terminating

Plaintiff's LTD benefits on May 20, 2009 was performed by Dr. Richard Delaney, PhD, at

Gaylord Hospital on December 13, 2007. (AR 540-42)  The evaluation states in relevant part:

> Summary and Conclusions: These results indicate that Ms. Fairbaugh is an individual who continues to demonstrate largely high average to superior level abilities in many areas despite a nearly 10 year history of multiple sclerosis.  She has been noticing some difficulties in her life with concentration and memory.  The current results indicate that in most instances she is able to compensate and overcome such problems, under relatively optimal condition[s] (e.g. relatively brief tasks, sufficient rest, and minimization of distraction/multi-tasking requirements.)  The current profile does document mild problems with psychomotor speed (greater on the non-dominant side) and subtle problems with sustained concentration and information processing – the latter only suggested by relatively weak incidental rather than directed learning in one instance.  Her memory for information effectively learned is excellent, and she shows many cognitive strengths.  It is most likely that difficulties in her everyday life and work would be more likely a result of fatigue and becoming "overloaded."  The profile, however, is much less striking for decline than for ability.

The EDSS score of 2.5 referenced and relied upon in LINA's termination letter to Plaintiff also requires some explanation.[7] The descriptions affixed to the EDSS scale range from "normal" for a score of zero to "death due to MS" for a score of 10.0. (See, e.g., AR 548) Scores of 2.0 and 2.5 are described on the form as "min disability," presumably indicating minimal disability, while a score of 3.0 indicates "mod disability," presumably an abbreviation for moderate disability. Id. Plaintiff's physician, Dr. Guarnaccia, cautions that, "The EDSS score is a physical function score that is not sensitive to cognitive dysfunction, pain, fatigue or stress, and, therefore, using it as a basis for denial of her claim is an inappropriate use of that scale." (AR 373) Nonetheless, for what it is worth and to the extent that it provides a snapshot of the degree to which Plaintiff's physical functioning was impaired by her multiple sclerosis over time, Plaintiff's EDSS scores, as reflected in the record, were as follows:

| September 12, 2007: | 2.0 | (AR 548) |
| October 16, 2007: | 2.0 | (AR 545) |
| December 17, 2007: | 2.0 | (AR 539) |
| May 16, 2008: | 2.0 | (AR 516) |
| June 16, 2008: | 2.0 | (AR 513) |
| July 21, 2008: | 2.0 | (AR 510) |
| August 25, 2008: | 2.5 | (AR 502) |
| September 30, 2008: | 3.0 | (AR 463) |
| November 10, 2008: | 3.0 | (AR 415) |
| February 17, 2009: | 2.0 | (AR 412) |
| May 12, 2009: | 2.5 | (AR 390) |

Notably, Plaintiff's EDSS score was 2.0 when her STD benefits commenced on May 17, 2008, was 3.0 when her LTD benefits were approved on October 28, 2008, and was 2.5 when her LTD

_____

[7] "EDSS" is the acronym for "Expanded Disability Status Scale," a rating system frequently used for classifying and standardizing the condition of people with multiple sclerosis. Lacking medical training, the Court does not pretend to independently interpret the EDSS scores, but merely relates verbatim the descriptions of those scores as they appear in the documents in the administrative record.

benefits were terminated on May 20, 2009.

<u>Plaintiff's Long Term Disability Benefits Appeal</u>

Plaintiff appealed LINA's termination of her LTD benefits, and supplemented her file with a letter dated July 27, 2009 from her treating neurologist, Dr. Guarnaccia.  (AR 373)  The letter from Dr. Guarnaccia stated in full:

> This is in response to a withdrawal of long term disability benefits for Paige Fairbaugh, who is my patient with relapsing multiple sclerosis.  Ms. Fairbaugh cannot perform the duties of her previous occupation because of her pain, fatigue and cognitive disfunction from her multiple sclerosis.  She was disabled at the time that her long term disability was granted and that remains true as her condition has not changed.  Indeed, it was and is my professional opinion that performance by Ms. Fairbaugh of the duties of her prior occupation, which involve extensive travel, long hours, sustained standing and walking for extended periods of time and highly stressful time-sensitive multi-tasking, would exacerbate the effects of her condition and cause substantial deterioration in her health status.  Multiple sclerosis is a lifelong condition and I would not expect her present disability to improve.  There are no specific diagnostic tests to demonstrate a progression in the effects of multiple sclerosis.  The neuropsychological testing did not specifically address her work related dysfunction.  MRI scans do not correlate with disability and should not be used for that purpose.  The EDSS score is a physical function score that is not sensitive to cognitive dysfunction, pain, fatigue or stress and, therefore, using it as a basis for denial of her claim is an inappropriate use of that scale.  Therefore, there is no basis for concluding that Ms. Fairbaugh's functional capabilities have changed to the extent that she is now able to engage in her previous occupation.

LINA then referred Plaintiff's medical records to **a** neurosurgeon, Norton Hall, M.D., for review.  LINA did not request an Independent Medical Examination ("IME") of Plaintiff, and Dr. Hall did not examine or interview Plaintiff.  On August 21, 2009, Dr. Hall issued a handwritten report (AR 369), which stated in full:

> Medical record review fails to reveal significant quantified, documented clinical findings to support the imposed restrictions.  There has been no progression of functional loss or impairment noted in file.  The N.P. eval of 12/13/07 essentially was unremarkable.  The cx's self-reported DQ of 11/3/08 indicates activity that would indicate cx could function at light level of activity.  No pain medication was listed on Rx list.  The A.P.'s L.O.V. of 5/12/09 & letter of 7/27/09 are devoid of any measured objective finding.

Thereafter, LINA upheld the termination of Plaintiff's LTD benefits, in a letter dated

August 25, 2009 denying Plaintiff's appeal. (AR 366-68) The letter stated in relevant part:

> Ms. Fairbaugh's occupation required light demand activities according to the Dictionary of Occupational Titles.... Physical demand requirements are in excess of those for sedentary work.... Long Term Disability benefits were paid from November 15, 2008 through May 20, 2009.... To ensure appropriate interpretation of the medical documentation, a review was completed with a Medical Director.
>
> The medical information on file clearly documents Ms. Fairbaugh's history of relapsing and remitting Multiple Sclerosis, and Ms. Fairbaugh's reported symptoms of fatigue, leg pain, headaches, spasms and cognitive difficulties. However, the medical information does not reveal any significant clinical findings to support a restriction of "no work." Dr. Guarnaccia indicates that Ms. Fairbaugh has had 3 reported flare-ups within the past year, demonstrates moderate upper and lower extremity paresthesia and reports cognitive dysfunction; however the records do not provide any measurable evidence of any severe physical deficits affecting function or to indicate a progression of functional loss or cognitive impairment. Furthermore, Ms. Fairbaugh's neuropsychological evaluation of December 13, 2007 was relatively unremarkable and her current EDSS physical function score reveals that Ms. Fairbaugh demonstrates full ambulation.
>
> After a complete review of the medical information on file and review and consult with a Medical Director, we find that the medical information does not provide evidence of a loss of function which would preclude [Ms. Fairbaugh] from performing the duties of her occupation. We are not indicating that a medical condition does not exist; rather, the severity of [Ms. Fairbaugh's] condition and its impact on [her] ability to function in her occupation is not demonstrated by the available medical information on file.

On that basis, Defendant affirmed its decision to terminate Plaintiff's long term disability

benefits.

Outcome of Social Security Appeal[8]

---

[8] On June 3, 2010, Plaintiff filed a Motion to Supplement the Record for Good Cause [Doc. 40], requesting that the May 21, 2010 Social Security Administration decision be added to the record in this case. Defendant opposes the motion on the basis that "the evidentiary record is limited to the materials before [Defendant] at the time it made its decision" [Doc. 42 at 1] and thus the Court may not rely on new information that was unavailable to Defendant when it decided to terminate Plaintiff's LTD benefits. *Id.* Defendant also maintains that the May 2010 SSA decision is irrelevant because the ALJ "applied the treating physician rule and considered new medical record evidence not available to [Defendant]." [Doc. 42 at 9] In response, Plaintiff

On May 21, 2010, subsequent to the filing of this lawsuit, Plaintiff was issued a fully favorable decision by the Social Security Administration, finding her disabled within the meaning of the Social Security Act, with May 17, 2008 as the date of onset. [Doc. 40, Ex. A]  In that ruling, the Administrative Law Judge ("ALJ") concluded that Plaintiff has "severe multiple sclerosis" ¶ 4, with "severe medically determinable impairments which consist of relapsing multiple sclerosis and moderate anxiety secondary to her neurological illness, and . . . nonsevere, short-term memory difficulty due to that illness." ¶ 3.  The ALJ found that "her executive functioning is significantly diminished compared to her pre-illness levels, and her subjective mental symptoms are credible" ¶ 4, and that "there is no evidence of symptom exaggeration." ¶ 5.  The ALJ also found that Plaintiff's former occupation "as a corporate events planner and corporate executive. . . was skilled, stressful work requiring independent decision making," ¶ 6, and concluded that Plaintiff is now unable "to sustain a regular, sedentary work week at [a] commercial pace." ¶ 5.  The ALJ stated in closing:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, then given her age, education and work experience, a finding of "not disabled" might have occurred . . . However, her exertional and nonexertional limitations, and the

notes that Defendant had previously included several pages of argument urging this Court to consider the earlier Social Security decision denying Plaintiff disability benefits as "buttress[ing] the reasonableness of [Defendant's] conclusion to terminate regular occupation LTD benefits." [Doc. 27 at 24-26]   The Court is cognizant of the obligation to evaluate Defendant's decisions with respect to Plaintiff's disability benefits in light of the information available to Defendant at the time the decisions were made.  Nonetheless, to the extent that Defendant repeatedly references the earlier Social Security denial to support its decision, it is reasonable to permit Plaintiff to update the record simply to reflect the factual reality that the previous Social Security decision has been reversed.  Therefore, for the sake of completeness of the record, Plaintiff's motion to supplement [Doc. 40] is GRANTED.  However, this Court does not rely on the May 21, 2010 SSA decision; indeed, before the motion to supplement was filed, the Court had already preliminarily arrived at the conclusion which is now expressed in this opinion, based on the evidence in the administrative record.

frequency of her relapses, so narrow the range of work the claimant might otherwise perform that she is entitled to a finding of "disabled."

¶ 10.

## II.    STANDARD OF REVIEW

The parties have filed cross motions for judgment on the administrative record.  Because "the Federal Rules of Civil Procedure do not contemplate such a mechanism," the Second Circuit treats appeals from rulings on motions for judgment on the administrative record as appeals from rulings on motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.[9]

*Flanagan v. First Unum Life Ins.*, 170 Fed. Appx. 182, 184 (2d Cir. 2006), citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003).  See also *Fortune v. Group Long Term Disability Plan*, 637 F. Supp. 2d 132, 141 (E.D.N.Y. 2009) ("Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA.").

"Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009), quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002).  "Although generally an administrator's decision

---

[9] Defendant proposes treating it as a "bench trial on the papers" pursuant to Rule 52 [Doc. 30 at 12-13]  Defendant cites *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) and *Parisi v. UNUMProvident Corp.*, 2007 U.S. Dist. LEXIS 93472 (D. Conn. Dec. 21, 2007).  However, as the latter case explains at *5, "*Muller* stands for the general proposition that a motion for judgment on the administrative record may be treated as a summary judgment motion; however, if summary judgment has already been decided, a decision on a subsequent motion for judgment on the administrative record is best treated as a bench trial 'on the papers.'" Given that there has been no prior summary judgment motion or ruling in this case, and given that proceeding under Rule 56 appears to be the more common practice with respect to claims for termination of disability benefits under ERISA, the Court will do so here.

to deny benefits is reviewed *de novo*, where, as here, written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Id.*, quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (internal quotation marks omitted).

Here, Plaintiff's Complaint alleges, "The Plan policy grants CIGNA no discretionary authority to determine a participant's eligibility for LTD benefits or to interpret the Plan's terms and provisions." (Compl. ¶ 10) However, in her Memorandum in Support of Motion for Judgment on the Administrative Record, Plaintiff concedes, "The UBS [Summary Plan Description] for the disability plan does provide discretionary authority." [Doc. 20 at fn. 11, citing AR 952-70]. See also Plaintiff's Response to Defendant's Proposed Findings of Fact [Doc. 37] at ¶ 2, admitting that "[t]he LTD Plan grants LINA, which acts as the Claims Administrator, the 'authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.'" [Doc. 31 at ¶ 2, quoting AR 255] Therefore, it is undisputed that the Plan conveyed discretion on Defendant, and the Court so concludes.

In light of the discretion afforded to Defendant by the Plan, arbitrary and capricious is the appropriate standard of review. Under this standard, an administrator's decision to deny ERISA benefits may be overturned

> "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and]…requires more than a scintilla but less than a preponderance." *Smith v. Champion Int'l Corp.*, 573 F. Supp. 2d 599, 615 (D. Conn. 2008) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

Courts reviewing plan administrators' benefits denials for arbitrariness and capriciousness are "not free to substitute [their] own judgment for that of the insurer as if [they] were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83-84 (quoting *Pagan*, 52 F.3d at 442). However, a court reviewing a plan administrator's decision must consider "whether the decision was based on a consideration of relevant factors." *Miller*, 72 F.3d at 1072. In determining whether relevant factors were considered and substantial evidence relied upon in an ERISA eligibility determination, courts are limited to the reasons given "at the time of the denial." *Karanda v. CT Gen'l Life Ins. Co.*, 158 F. Supp. 2d 192, 198, n. 4 (D. Conn. 2000) (citing *Short v. Cent. States, Se. & Sw. Areas Pension Fund*, 729 F.2d 567, 575 (8th Cir. 1984)).

*Lanoue v. Prudential Ins. Co. of Am.*, 2009 U.S. Dist. LEXIS 95086 at *7-8 (D. Conn. Sept. 25, 2009).

Furthermore, the arbitrary and capricious standard applies notwithstanding Plaintiff's allegations that Defendant had a conflict of interest. In accordance with *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Second Circuit has stated that "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008).

In support of her claim of conflict of interest, Plaintiff notes that Defendant "award[ed] [Short Term Disability] benefits under the regular occupation standard, which were paid by UBS, through their six-month term, [but] terminat[ed] Long Term Disability benefits, which [Defendant] was required to pay, under the regular occupation standard after a fraction of their term had elapsed." [Doc. 38 at 19; see also Doc. 20 at 28] Defendant responds that it undertook a periodic review of Plaintiff's file and found the medical support lacking, and that it would not have awarded LTD benefits in the first place if the conflict that Plaintiff alleges did exist.

Plaintiff contends that, given the absence of evidence of improvement in Plaintiff's medical condition, there is nothing aside from conflict of interest to explain Defendant's determination that she no longer qualified for disability benefits. Plaintiff also suggests that there is direct evidence of conflict of interest, in that Defendant's letter terminating Plaintiff's benefits (AR 384) states that she had been laid off from UBS, "a matter of seemingly no relevance to the determination of whether she continued to qualify for LTD benefits." [Doc. 38 at 23; see also Doc. 20 at 6]

While those facts do not amount to a smoking gun revealing conflict of interest, they may reflect the inherent structural conflict of interest that can occur when the same entity both evaluates and pays benefits claims. As stated *supra*, both the Supreme Court and the Second Circuit have noted this potential conflict of interest. *McCauley*, 551 F.3d at 133, citing *Glenn*, 554 U.S. 105 (2008) ("[A] plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion."). However, because this Court concludes that Defendant's termination of Plaintiff's LTD benefits was clearly arbitrary and capricious and not supported by the administrative record, the Court need not apply the additional weight of a finding of conflict of interest in order to determine that Defendant abused its discretion in terminating Plaintiff's long term disability benefits.

III.    DISCUSSION

Absence of Improvement in Plaintiff's Medical Condition

The "your occupation" standard applied to short term disability claims and the "regular occupation" standard applied to long term disability claims during the first 24 months are

substantively identical.[10]  Based on the medical evidence presented to it, Defendant judged

Plaintiff to be unable to perform her regular occupation, and she received short and then long

term disability benefits on that basis continuously for over a year, from May 17, 2008 through

May 20, 2009.

Then, after "a review of the information on file," Defendant terminated Plaintiff's

disability benefits, on the basis that the "restrictions and limitations to preclude your own Light

occupation are not clinically supported.  Although [Plaintiff's physician] Dr. Guarnaccia feels

that you can not perform your prior occupation, he has failed to document a level of severity that

supports such limitations." (AR 384-85)  The letter terminating Plaintiff's benefits explained that

Defendant specifically relied upon the "medical records from Dr. Guarnaccia from July 2008

through May 2009" and a neuropsychological ("NP") evaluation performed by Dr. Richard

Delaney at Gaylord Hospital on December 13, 2007.  *Id.*

It is unclear how a neuropsychological evaluation performed in 2007, which was already

on file when both Plaintiff's short and long term disability claims were approved in 2008, could

possibly provide a rational basis for revoking Plaintiff's disability benefits in 2009.  If the

information in the NP evaluation did not previously disqualify Plaintiff from disability benefits,

then Defendant's reviewing the same report for a second or third time could not reasonably or

justifiably result in a different conclusion with respect to its impact on Plaintiff's claim.

Nor did the medical records from Dr. Guarnaccia, upon which Defendant claimed to rely

---

[10] For short term disability, "Disability or Disabled means that you are unable to perform all the material and substantial duties of *your occupation* on an active employment basis because of an Injury or Sickness." (AR 813) (emphasis added).  In the first 24 months of long term disability, "[a]n Employee is Disabled if, because of Injury or Sickness he or she is unable to perform all the material duties of his or her *regular occupation*." (AR 245) (emphasis added).

in terminating Plaintiff's benefits, demonstrate an improvement in Plaintiff's condition. To the contrary, they indicated that Plaintiff's condition had remained largely unchanged, or, if anything, had worsened since disability benefits had been granted. As the termination letter acknowledged, Plaintiff's "EDSS score [has] now increased to 2.5," whereas Plaintiff's EDSS score had been 2.0 when her disability benefits were first approved on May 17, 2008. A higher score reflects a greater level of impairment in physical functioning.

While the arbitrary and capricious standard of review is deferential, "[t]he [plan administrator] must articulate a rational connection between the facts found and the choice made." *Sisavang Danouvong v. Life Ins. Co. of N. Am.*, 659 F. Supp. 2d 318, 324 (D. Conn. 2009), quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974). Here, Defendant found Plaintiff to be disabled and granted her benefits, and then arbitrarily revoked them a year later, purportedly based on information which had previously been available to Defendant, and on new information which failed to indicate an improvement in Plaintiff's condition.

In *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001), the claimant had been receiving disability benefits for fifty-four months when the plan administrator determined that Connors was not disabled within the meaning of the policy. The district court concluded that the administrator had not erred in terminating Connors's benefits. *Id.* at 130. The Second Circuit, however, held that the district court had erred in failing to consider the fact that the administrator's "finding of ineligibility was not in response to an application for benefits, but rather *a reversal in policy preceded by no significant change in Connors's physical condition*." *Id.* at 136 (emphasis added). The review in *Connors* was under the more exacting *de novo*

-16-

standard, but the rationale underlying the Second Circuit's objection appears equally valid in this context: absent some type of fraud, it is the very definition of arbitrary and capricious to determine that the medical evidence shows someone to be disabled, and then to determine, in the absence of any significant change in that person's physical condition, that they are not disabled.

Defendant contends, "Plaintiff implicitly suggests that due to LINA's initial decision to approve her LTD claim, LINA should be estopped from conducting subsequent reviews of her claim and terminating benefits if it concludes that Fairbaugh no longer satisfies the Plan's requirements for benefits." [Doc. 27 at fn. 6] Plaintiff makes no such argument. To the contrary, as Defendant itself notes, Defendant was certainly entitled to monitor Plaintiff's condition and to revoke benefits if she became no longer disabled. In the letter approving her long term disability benefits, Defendant informed Plaintiff, "We will continue to monitor your claim, and periodically, we will request updated information to confirm your restrictions and limitations. Please be aware that payment of future benefits will depend on confirmation of your continuing disability status, and on other applicable contract provisions." (AR 281)

However, as this suggests, if the updated information reflected an absence of improvement in Plaintiff's condition, which it did, then it is difficult to see how Defendant's reaching a different result in the face of substantially unchanged medical information could be anything but arbitrary and capricious. Indeed, Defendant's letter terminating Plaintiff's benefits erroneously suggests that, in order to continue to receive benefits under the Plan, Plaintiff had to prove not merely that she remained disabled, as Defendant had previously concluded she was, but that her condition had actually worsened. The termination letter stated, "We do not have any diagnostic testing demonstrating a *progression* in your condition. Your treatment has remained

*largely unchanged.*" (AR 384-85) (emphases added). Dr. Hall, who reviewed Plaintiff's file for Defendant on appeal, echoed this theme when he stated, "There has been *no progression* of functional loss or impairment noted in file." (AR 369) (emphasis added). In fact, there is nothing in the Plan that requires a person who has been judged disabled to prove that their disability continues to worsen simply in order to remain eligible for benefits. Given that the evidence in the administrative record demonstrated that Plaintiff's medical condition was essentially unchanged, it was arbitrary and capricious to revoke the disability benefits for which Plaintiff had previously been approved.

<u>Failure to Adequately Medically Support Decision</u>

When Plaintiff appealed the termination of benefits, Defendant referred her medical records for review by neurosurgeon R. Norton Hall. Dr. Hall's handwritten report stated in its entirety:

> Medical record review fails to reveal significant quantified, documented clinical findings to support the imposed restrictions. There has been no progression of functional loss or impairment noted in file. The N.P. eval of 12/13/07 essentially was unremarkable. The cx's self-reported DQ of 11/3/08 indicates activity that would indicate cx could function at light level of activity. No pain medication was listed on Rx list. The A.P.'s L.O.V. of 5/12/09 & letter of 7/27/09 are devoid of any measured objective finding.

(AR 369) Plaintiff objects, "Even a cursory review of Ms. Fairbaugh's medical records would have revealed that Dr. Guarnaccia's May 2009 office note indicates that Ms. Fairbaugh had been prescribed Hydrocodone for pain from August 2008." [Doc. 20 at 14, citing AR 388] The "Active medications" section of the document cited supports Plaintiff's statement, indicating that Dr. Hall's statement that "No pain medication was listed on Rx list" was erroneous.

Dr. Joseph Guarnaccia, the Director of the Multiple Sclerosis Treatment Center at Griffin

-18-

Hospital in Derby, has been treating Plaintiff since 2002. (AR 566) Based on seven years of treating Plaintiff for multiple sclerosis, he reached the following conclusions with respect to the impact of her condition on her ability to work, which he shared with Defendant in a letter dated July 27, 2009:

> Ms. Fairbaugh cannot perform the duties of her previous occupation because of her pain, fatigue and cognitive disfunction from her multiple sclerosis. She was disabled at the time that her long term disability was granted and that remains true as her condition has not changed. Indeed, it was and is my professional opinion that performance by Ms. Fairbaugh of the duties of her prior occupation, which involve extensive travel, long hours, sustained standing and walking for extended periods of time and highly stressful time-sensitive multi-tasking, would exacerbate the effects of her condition and cause substantial deterioration in her health status. Multiple sclerosis is a lifelong condition and I would not expect her present disability to improve. There are no specific diagnostic tests to demonstrate a progression in the effects of multiple sclerosis.

(AR 373) By contrast, Dr. Hall never examined, interviewed or met Plaintiff. He reviewed her file only on appeal, after her disability benefits had already been terminated. Indeed, it appears that Plaintiff's benefits were terminated solely based upon a review of her file by a Nurse Claim Manager (AR 384-85), with no review by a doctor until the appeal, and then only by one doctor. In most cases, at least by the appeal stage, the plan administrator has sent the patient's file for review by several doctors. *See, e.g., Fortune v. Group Long Term Disability Plan*, 637 F. Supp. 2d 132, 137-38 (E.D.N.Y. 2009) (upholding denial of long term disability benefits to a multiple sclerosis patient, where the plan administrator had sent the patient's medical file to at least three doctors for review).[11] *See also Hobson*, 574 F.3d at 90 (plan administrator had "a total of seven

_____

[11] Furthermore, in that case, Fortune's own doctor had "noted that Fortune's condition had improved" and that she "was not taking any prescribed medications to alleviate symptoms related to her multiple sclerosis," and that the conclusions of one of the doctors to whom the administrator had referred plaintiff's file "seem reasonable." *Fortune*, 637 F. Supp. 2d at 136-37. By contrast, Plaintiff's doctor in the instant case continues to insist that she is disabled from work.

-19-

independent physicians" review Hobson's file).

Defendant argues that it was not required to order an Independent Medical Evaluation ("IME") of Plaintiff, citing *Hobson*, 574 F.3d at 91, where the Second Circuit held that "the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled." Given that Defendant had previously concluded that Plaintiff was disabled and had awarded benefits on that basis, it is questionable whether Plaintiff's medical evidence could reasonably be characterized as being inadequate on its face to establish disability. While declining to order an IME was within Defendant's discretion, the weight of Defendant's medical evidence supporting the termination of benefits is somewhat diminished thereby.

Defendant also contends that Plaintiff is inappropriately seeking to have the Court apply the treating physician rule, affording the views of Plaintiff's doctor a favored status. The treating physician rule, which applies in social security benefits determinations, does not apply in this context, and "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). At the same time, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. While no special deference is automatically due to Plaintiff's treating physician, it is arbitrary and capricious to disregard the weight of medical evidence with respect to Plaintiff's condition. Defendant dismissed the reports of a physician specializing in multiple sclerosis, who had been treating Plaintiff for that condition and seeing her regularly for many years, in favor of a single review of her file by a single doctor who had never met or examined Plaintiff. Furthermore, the

six sentence report that doctor produced, after being referred Plaintiff's file for the first time

upon appeal, contains a factual error with respect to the medication she was taking, suggesting

that he conducted a less than thorough review of the file.  While Defendant has significant

discretion, relying on such a cursory review of Plaintiff's medical condition in deciding to

terminate her benefits is an arbitrary and capricious exercise of the discretion with which

Defendant has been entrusted under the Plan.

Applying the Wrong Standards: Regular Occupation versus Any Occupation, and Light
Occupation versus Sedentary Occupation

As previously discussed, Plaintiff's medical condition had not substantially changed

between the time she was approved for disability benefits and the termination of those benefits.

What had changed was that Plaintiff's initial claim for Social Security disability benefits was

denied on March 11, 2009.  The denial can be considered in this ruling, as it was part of

administrative record upon which Defendant made its determination to terminate Plaintiff's

disability benefits two months later.

The standard applied by the Social Security Administration in deciding such claims is

essentially an "any occupation" standard.  A Social Security disability claimant is entitled to

receive Social Security disability benefits only if she shows she cannot perform her former

employment, and the Commissioner fails to show that the claimant can perform alternate gainful

employment.  *See* 20 C.F.R. § 404.1520(f); *see also Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir.

1998) (citations omitted).  Because the Social Security disability applicant must be incapable of

alternate employment, it is harder to prove disability under that standard than it is under the

regular occupation standard that applied to Plaintiff's claim during the first 24 months of long

term disability coverage.

Defendant argues at length that this Court should consider the Social Security Administration's initial denial of Plaintiff's disability benefits claim as supporting Defendant's own conclusion to terminate her benefits: "The fact that the SSA reviewed the same evidence and concluded that Fairbaugh was not disabled from any occupation strongly supports the position that LINA's termination of her regular occupation benefits was reasonable, particularly here where Fairbaugh claims that she cannot work in any occupation." [Doc. 27 at 26]  However, given that fact that, under the Plan terms, Defendant was limited at this stage to determining whether Plaintiff could perform her own regular occupation, it is problematic that Defendant apparently considered the Social Security Administration's decision under the any occupation standard to be persuasive.  Without reaching any conclusions on the matter, it is conceptually possible that Plaintiff could perform some jobs notwithstanding her multiple sclerosis but that her last job at UBS was not one of them.

Furthermore, the record reveals some confusion on Defendant's part as to Plaintiff's job classification.  While in some entries it is listed correctly, i.e. "Cx is 47 yo female meeting planner, a light occ." (AR 33), in numerous other entries it is listed incorrectly, i.e. "Cx is a 46 y/o female project leader, sed occ."  (AR 37, 41, 57)  The official classification of Plaintiff's job under the Dictionary of Occupational Titles ("DOT") is "light," which by definition involves "physical demand requirements . . . in excess of those for sedentary work."  (AR 366)

To the extent that Plaintiff was found not to be disabled because she can, in the estimation of Defendant, do sedentary jobs, then that is incorrectly applying an any occupation standard instead of the regular occupation standard that controls at this stage.  It is arbitrary and

capricious to apply a standard other than the one set forth in the Plan. "[W]here the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious." *Pepe v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 559 F.3d 140, 147 (2d Cir. 2009), quoting *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008). The relevant question for determining Plaintiff's disability through November 2010 is whether she is disabled from doing her own regular occupation, which has a light classification, and which the record reflects involves "extensive travel, long hours, sustained standing and walking for extended periods of time and highly stressful time-sensitive multi-tasking," as Dr. Guarnaccia describes it. (AR 373) Defendant objects that "Neither Plaintiff nor her counsel even began to advance these activities as material duties of her occupation until after LINA terminated benefits." [Doc. 27 at 15] Contrary to Defendant's contention, the characterization of Plaintiff's job as involving travel and being stressful is not a justification after the fact but rather is amply supported in the administrative record.

For example, a note by a LINA representative from a phone conversation with Plaintiff on June 19, 2007 indicates that Plaintiff reported then that she "travels approximately 2 times a month for company required functions." (AR 194) The notes from a LINA representative's phone interview with Plaintiff on July 30, 2008 indicate that Plaintiff is a "corporate event planner, sedentary mostly but is deadline driven and she has to travel to the events all over the country and be there to run everything." (AR 109) Plaintiff's annual salary as of May 17, 2008 was $106,000 (AR 446), which is a salary not normally awarded for menial tasks, suggesting that the job involved some significant degree of responsibility. In a letter received by LINA on June

27, 2008, which significantly pre-dated the termination of benefits on May 20, 2009, Plaintiff's physician, Dr. Guarnaccia stated: "As a result of her most recent visit, it is my opinion that extreme stress from her many job assignments has affected her health.  Due to her long work hours and travel schedule, she has been unable to get the required rest and physical conditioning necessary to balance her MS condition with an effective work product and life style."  (AR 610)

Furthermore, in completing Defendant's "Disability Questionnaire and Activities of Daily Living" form on November 3, 2008, Plaintiff described the major duties of her job as "Corporate Event Planner – Contracts, Budgets, Menus, Transportation, List [Management], Invitations, Gifts, Decor, Tickets."  (AR 401)  The "Occupation Description" for a "Meeting Planner" lists tasks which implicate travel, including "coordinates activities of facilities, exhibitors, service providers, and event support staff, such as registration, hospitality, and publicity committees, prior to and during event," and "may manage onsite event activities."  (AR 403)  When Defendant requested Plaintiff's job description from her employer UBS in October 2008, UBS provided a description for "Project Leader: Event Marketing - Client Events."  (AR 449-52)  According to that job description, "The Client Events team supports all business divisions and is responsible for all external client events, internal events, seminars, client dinners, holiday events, Board Meetings and sponsorships in North and South America."  (AR 451)  It further states that, as a Project Leader, Plaintiff would "act as a senior planner for special projects," "manage client events projects once they have been assigned and take ownership of the project" and "assist the Conference Event Team and/or the Roadshow Team when deemed necessary," among numerous other responsibilities.  (AR 451-52)

It was arbitrary and capricious of Defendant to disregard this evidence in the record that

Plaintiff's regular occupation was stressful, required multi-tasking and adherence to deadlines, and involved more than occasional travel. Such evidence supported and bolstered the reasonableness of her doctor's conclusion that she could not continue to perform her regular occupation in light of the limitations imposed by her multiple sclerosis. Given that Plaintiff's regular occupation was classified as "light," meaning that it requires more physical exertion than jobs classified as "sedentary," it was a misapplication of the Plan's "regular occupation" standard to imply that Plaintiff was not disabled because she might be able to perform sedentary jobs, and to fail to take into consideration the true nature of Plaintiff's job, as demonstrated in the administrative record. It was also arbitrary and capricious for Defendant to treat as persuasive the Social Security Administration's initial denial of her disability claim under the more exacting "any occupation" standard when the only question properly before Defendant was whether Plaintiff was disabled from her regular occupation.

In arguing that Defendant applied the wrong standard in deciding her long term disability claim, Plaintiff also relies on an April 15, 2009 letter from Defendant, which stated, "It has been determined that you are not Totally Disabled from performing any and all occupations. The information in your file reflects that you are capable of performing less demanding work, and that you possess the transferrable skills to perform a sedentary occupation." (AR 934-37) Plaintiff cites this letter in her Complaint as bearing upon her LTD claim. (Compl. ¶ 18) However, that is a misconstruction of the letter, which was a ruling on Plaintiff's claim for waiver of premium benefits under a separate life insurance policy, where the any occupation standard did apply, and thus it was appropriate in that context to consider whether Plaintiff could do sedentary work. The letter had no bearing on the disposition of Plaintiff's long term disability

benefits claim, and therefore the Court does not rely on it with regard to whether it was an abuse of discretion to terminate Plaintiff's LTD benefits.

Finally, the Court may not and does not draw any conclusions about Plaintiff's ability to perform sedentary jobs under the "any occupation" standard that will apply with regard to LTD benefits after 24 months have passed. That question is not before the Court.

## IV.     ADDITIONAL ISSUES

<u>Life Insurance</u>

In addition to her claim for disability benefits, Plaintiff also submitted to Defendant a claim for Waiver of Premium coverage under her Group Term Life Insurance policy, number FLX 51648, which is also underwritten by Defendant. (AR 934-37) Under that policy, "An Employee is Disabled if, because of Injury or Sickness, he or she is unable to perform all the material duties *of any occupation* for which he or she may reasonably become qualified based on education, training or experience." *Id.* (emphasis added). Plaintiff's claim for Waiver of Premium coverage was denied by letter dated April 15, 2009. *Id.* In denying the claim, the letter stated, "It has been determined that you are not Totally Disabled from performing any and all occupations. The information in your file reflects that you are capable of performing less demanding work, and that you possess the transferrable skills to perform a sedentary occupation." *Id.* The letter indicated that a Transferable Skills Study had been performed, taking into account Plaintiff's age, education, experience, and medical condition, and listed four occupations, as defined in the Dictionary of Occupational Titles, that had been identified as appropriate for her, all of which were sedentary. *Id.*

In the conclusion to the memorandum in support of her motion for judgment on the

administrative record, Plaintiff lists the relief she seeks, which includes reimbursement for the life insurance premiums which she claims should have been waived beginning in April 2009, and reinstatement of life insurance premium waiver benefits going forward. However, Plaintiff's complaint makes no claim whatsoever regarding the life insurance policy or waiver of premium benefits under that policy. While Plaintiff's complaint quotes from the letter denying her claim for waiver of premium benefits (Compl. ¶ 18), she erroneously offers that letter as evidence that Defendant had applied the wrong standard in terminating her long term disability benefits. At no point in the Complaint is the life insurance policy or waiver of premium benefits specifically mentioned. In the introduction to the Complaint, Plaintiff defines "the Plan" as an "ERISA welfare benefit plan for provision of Long Term Disability ("LTD") benefits" in which Plaintiff is a participant. Thus, in seeking "enforcement of the Plan terms" (Count One), Plaintiff is clearly referring to the LTD benefits plan, not to the Group Term Life Insurance policy. Nor is there a separate count related to the Group Term Life Insurance policy.

Given that it was not contained in the complaint, Plaintiff may not raise the claim regarding Waiver of Premium coverage under the Group Term Life Insurance policy for the first time upon motion for summary judgment, and therefore the claim is denied. Had the life insurance claim been properly before the Court, Plaintiff's prevailing in establishing her entitlement to long term disability benefits would not automatically have entitled her to waiver of the life insurance premium. The currently applicable test under the long term disability policy is whether Plaintiff is disabled from her own regular occupation, while the life insurance policy requires that to be entitled to waiver of the premium, Plaintiff must be disabled from performing any occupation.

Finally, it is not clear how Plaintiff remains eligible for group life insurance benefits, let alone a waiver of the premium associated with those benefits, in light of the fact that she is no longer employed by UBS.  "Your benefits under group life insurance and group accident insurance will continue while you are receiving benefits under the LTD Program, *provided that you remain employed by the Bank*..." (AR 966) (emphasis added).

Medical Insurance

By contrast, employees on long term disability remained eligible for coverage under the UBS medical insurance program even if their employment with UBS had been terminated. "Your benefits under the UBS AG Group Medical and Dental Program will continue (provided you continue to make premium payments) until benefits are no longer payable to you under the LTD Program, *even if your employment with the Bank is terminated*."  (AR 966) (emphasis added).  Accordingly, Plaintiff's complaint clearly identifies "continued participation in the UBS medical plan" as being among the benefits afforded by the LTD Plan, to which she was denied access.  (Compl. ¶ 26)  She seeks "restitution . . . in the amount of any losses sustained by Ms. Fairbaugh in consequence of the wrongful conduct alleged herein, including as to her loss of entitlement to UBS medical plan benefits, together with pre-judgment interest."  (Compl. Relief ¶ 3)

The conclusion to Plaintiff's memorandum of law in support of her motion for judgment on the administrative record simply states, without citation to the record and without providing any documentation or affidavit, that her "cost of obtaining medical coverage" is $537.56 per month, presumably representing her current monthly premium. [Doc. 20 at 31]  However, Plaintiff would have paid a premium under the UBS medical plan as well.  (AR 966)  Therefore,

it appears that she is entitled to reimbursement only for the difference between what she has actually paid and what she would have paid with coverage through UBS, assuming that the UBS coverage was less expensive. If she wishes to pursue reimbursement for such costs, Plaintiff is directed to submit adequate documentation on or before October 1, 2010, unless the parties are able to stipulate to the amount of the award for Plaintiff's medical costs.

Attorney's Fees

An application for attorney's fees in an ERISA case is governed by 29 U.S.C. § 1132(g)(1) ("the court in its discretion may allow a reasonable attorney's fee and costs of action to either party"). "[T]he decision whether to award such [attorney's] fee[s] is ordinarily based on the five *Chambless* factors, to wit: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." *Id.* at 47, citing *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir. 1987). "ERISA's attorney's fee provisions must be liberally construed to protect the statutory purpose of vindicating employee benefits rights, and a failure to satisfy the fifth *Chambless* factor does not preclude an award of attorney's fees." *Id.* (citations and internal quotation marks omitted).

The Court concludes that, for the reasons set forth at length *supra*, Defendant is sufficiently culpable, notwithstanding its protestations of the absence of bad faith, for arbitrarily terminating Plaintiff's long term disability benefits that an award of Plaintiff's reasonable attorney's fees is equitable. Furthermore, given that Plaintiff has prevailed, a weighing of the

relative merits of the parties' positions also favors awarding Plaintiff her reasonable attorney's fees and costs in prosecuting this action. Defendant is able to satisfy such an award, and it will have the effect of deterring Defendant and others similarly situated from arbitrarily terminating the benefits of other disability plan participants in like circumstances. In that regard, although not directly, it confers some degree of common benefit on plan participants to reimburse Plaintiff for her attorney's fees in litigating to reverse a benefits termination that amounted to an abuse of discretion by Defendant.

Plaintiff is hereby directed to submit her motion for attorney's fees, along with the necessary supporting documentation[12] and a detailed proposed calculation, on or before October 1, 2010, unless the parties are able to stipulate to the amount of the award for Plaintiff's attorney's fees.

<u>Pre-Judgment Interest</u>

ERISA "authoriz[es] the district court to award prejudgment interest to a successful ERISA claimant, and that decision, like the decision to award attorney's fees, is committed to the sound discretion of the district court. Like an award of attorney's fees for a successful ERISA claim by an employee benefit plan participant, prejudgment interest is an element of [the plaintiff's] complete compensation." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 53-54 (2d Cir. 2009) (citations and internal quotation marks omitted). "[A]n award of prejudgment interest may be needed in order to ensure that the defendant not enjoy a windfall as a result of its wrongdoing." *Id.* at 54 (citations omitted). "[T]he factors that the district court is to consider in

---

[12] Plaintiff's application for attorney's fees must contain contemporaneous time records that comply with the Second Circuit's requirements articulated in *New York Ass'n. of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

determining whether to award prejudgment interest are (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* at 55 (citations and internal quotation marks omitted).

The Court concludes that prejudgment interest is justified in this instance, where Plaintiff's LTD benefits were intended to replace her income, absent which she may have incurred debt to cover living expenses, upon which she would owe interest. Alternatively, had she received the LTD benefits and not spent them, she would have earned interest on the money, an opportunity which she has been denied, while Defendant has enjoyed use of the funds and has earned interest thereon. Therefore, the need to fully compensate Plaintiff, a consideration of the equities, and the remedial purpose of ERISA, which, as discussed *supra*, is to vindicate employee benefits rights, all favor awarding prejudgment interest.

Plaintiff maintains that the amount of prejudgment interest should be determined with reference to state law. [Doc. 20 at 29, citing *Valle v. Joint Plumbing Industry Bd.*, 623 F.2d 196, 206 fn. 19 (2d Cir. 1980) (citations omitted).] Plaintiff states that Connecticut's prejudgment interest statute, Conn. Gen. Stat. 37-3a, provides for "interest at the rate of ten percent a year, and no more, . . . as damages for the detention of money after it becomes payable." Plaintiff seeks ten percent interest on each monthly payment wrongfully withheld. [Doc. 20 at 30] However, "prejudgment interest awards under ERISA serve as compensation to a plaintiff for the lost use of money wrongly withheld; such awards may not penalize the defendant." *Isaac Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 620 (6th Cir. 1998). Therefore, it may not be appropriate,

in light of recent interest rates, to award ten percent prejudgment interest if that more than compensates Plaintiff.

Furthermore, "federal courts need not incorporate state law as the federal common law rule for the applicable prejudgment interest rate." *Id.* at 619. Therefore, "[a]lthough a district court may look to state law for guidance in determining the appropriate prejudgment interest rate, . . . the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards." *Id. See also Blanton v. Anzalone*, 813 F.2d 1574, 1576 (9th Cir. 1987) (District court abused discretion in not awarding pre-judgment interest at rate which corresponds to rate established by Congress for post-judgment interest under 28 U.S.C. § 1961). Defendant in this case did not brief the issue of pre-judgment interest, stating that "ERISA only authorizes the award of pre-judgment interest to a *successful* ERISA claimant." [Doc. 27 at 32] (emphasis in original). Given that Plaintiff has now succeeded, the Court invites briefing from the parties, to be filed on or before October 1, 2010, on whether it should apply the rate described in 28 U.S.C. § 1961 for post-judgment interest in determining the pre-judgment interest due here, and if so, what the amount of pre-judgment interest is. Alternatively, the Court will accept a stipulation from the parties as to the appropriate amount of pre-judgment interest.

V.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Judgment on the Administrative Record [Doc. 19] is GRANTED, and Defendant's Motion for Judgment on the Administrative Record [Doc. 29] is DENIED. Judgment shall enter for Plaintiff, and her long term disability benefits under the Plan shall be reinstated immediately. Plaintiff is also entitled to immediate payment of the $5,300 per month in long term disability benefits that she should have been

receiving from May 20, 2009 through the date of this order, which is approximately fifteen (15) months. Therefore, Defendant is ordered to pay Plaintiff $79,500 on or before August 31, 2010, rather than awaiting resolution of the outstanding issues of Plaintiff's medical costs, attorney's fees and costs, and pre-judgment interest, regarding which a supplemental order and judgment will issue once they have been resolved. The deadline for filings on those matters is October 1, 2010. Alternatively, the parties are invited to consult with each other in light of the decision on the merits, and determine whether they can stipulate to an appropriate amount with respect to any or all of the outstanding issues. If so, the Court will enter the supplemental judgment for Plaintiff accordingly, in the amount and on the terms agreed to by the parties, provided the amount and terms are reasonable and consistent with the Court's conclusions as set forth herein.

       SO ORDERED.

Dated: New Haven, Connecticut

       August 16, 2010

                                    */s/ Charles S. Haight, Jr.*
                                     Charles S. Haight, Jr.
                                     Senior United States District Judge