# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

PAIGE FAIRBAUGH,

        Plaintiff,

v.

                         3:09-cv-1434 (CSH)

LIFE INS. CO. OF NORTH AMERICA,
    ET AL,
            Defendants.

## RULING ON DEFENDANT'S MOTION TO RECONSIDER, PLAINTIFF'S MOTION FOR CONTEMPT, AND PLAINTIFF'S APPLICATIONS FOR ATTORNEY'S FEES

Two motions and two applications are currently before the Court in the present action. First, Defendant Life Insurance Co. of North America ("LINA") has filed a Motion to Reconsider [Doc. 46] calling on the Court to reconsider portions of the Ruling on Cross-Motions for Judgment on the Administrative Record [Doc. 44], reported at 737 F.Supp.2d 68 (D. Conn. 2010), which the Court issued on August 16, 2010 (the "2010 Ruling"). Second, Plaintiff Paige Fairbaugh ("Fairbaugh") has filed a Motion for Contempt [Doc. 52] asking the Court to hold Defendant in contempt for failing to comply with the Judgment issued in this action on August 17, 2010 (the "Judgment") [Doc. 45]. Third, Plaintiff has filed two Applications for Attorney's Fees [Docs. 55, 70]. These filings raise related issues and are best disposed of in this single Ruling.

The current submissions all arise from the 2010 Ruling, familiarity with which is assumed. That Ruling held that Defendant violated the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, when it terminated Plaintiff's long-term disability (LTD) benefits. The

2010 Ruling, *inter alia*, granted Plaintiff the following relief:  (1) Defendant was ordered to pay Plaintiff $79,500 on or before August 31, 2010, representing wrongfully unpaid LTD benefits; (2) Plaintiff was granted reimbursement for certain medical-insurance costs if she submitted adequate documentation of those costs before October 1, 2010 (a deadline subsequently extended to October 15, 2010); and (3) Plaintiff was awarded attorney's fees, in an amount to be determined subsequently.  On August 17, 2010, the Court issued the Judgment, which included, *inter alia*, the order regarding the $79,500 payment and stated that "[t]he Court will enter a Supplemental Judgment, if necessary, in respect to any outstanding issues regarding fees, costs and interest."

On August 30, 2010, Defendant filed the Motion to Reconsider, asking the Court to modify the Judgment.  On October 12, 2010, Plaintiff filed the Motion for Contempt, alleging that Defendant refused to comply with the Court's order that it pay $79,500 not later than August 31, 2010.  Defendant, replying to that Motion, conceded that it had not paid the sum of $79,500.  *See infra*.  Plaintiff filed her application for attorney's fees on October 15, 2010, and added a supplemental application on April 17, 2012.  Plaintiff did not file documentation of her medical-insurance costs at any time.

## I.      DEFENDANT'S MOTION TO RECONSIDER

Defendant calls upon the Court to make two modifications to the 2010 Ruling:  (1) reduction of the award of back LTD benefits to reflect Plaintiff's receipt of Social Security disability benefits, and (2) reversal of the award to Plaintiff of reimbursement for medical-insurance costs.  The Court considers each of these issues in turn.

### A.      The Award of Back LTD Benefits

The first issue is Defendant's assertion that the Court must reduce its award to Plaintiff for

unpaid LTD benefits from $79,500 to $35,660.   Defendant Life Insurance Company of North America's Memorandum of Law in Support of its Motion to Reconsider the Court's Rulings on Cross-Motions for Judgment on the Administrative Record ("Recon. Supp. Memo.") [Doc. 47] at 5.  Because the sequence of events is of central importance for this issue, it is useful to set forth a timeline of relevant events.

(1)  On March 9, 2009, the Social Security Administration ("SSA") denied Plaintiff's initial application for Social Security disability benefits.

(2)  On February 22, 2010, in this Court, briefing on the Motions for Judgment on the Administrative Record was completed.

(3)  On May 17, 2010, the SSA issued an award (the "May 2010 Award") reversing its earlier decision and establishing Plaintiff's entitlement to such benefits for the period from May 17, 2008 onwards.

(4)  On June 3, 2010, Plaintiff filed a Motion to Supplement the Record for Good Cause [Doc. 40], seeking to add the May 2010 Award to the administrative record in this matter, and attaching a copy of that Award.

(5)  On June 23, 2010, Defendant filed a brief in opposition to that motion [Doc. 42].

(6)  On August 16, 2010, the Court issued the 2010 Ruling.

(7)  On August 30, 2010, Defendant filed the Motion to Reconsider, which made for the first time the argument that the Court's award of LTD benefits should be reduced by the amount of Plaintiff's Social Security disability benefits.

Defendant argues that under the terms of relevant LINA policy (the "Plan"), the LTD benefits

3

payable to Plaintiff should be reduced by the amount of any Social Security disability benefits that she receives.   Recon. Supp.  Memo. at 5.   Defendant further argues that it was clear error for the Court not to do so.  *Id.*  Defendant observes that the SSA's May 2010 Award granted Plaintiff such benefits, including a monthly payment of $2,097 and an immediate payment of $39,646 representing unpaid back benefits.

This argument is untimely.  A motion to reconsider is not the place to make arguments that the movant could have made in its original briefing but failed to make.  "It is black letter law that a 'motion for reconsideration may not be used to advance new facts, issues or *arguments* not previously presented to the Court.'"  *Nat'l Union Fire Ins. Co. of Pittsburgh PA v. Las Vegas Prof'l Football Ltd.*, 409 Fed. Appx. 401, 402-03 (2d Cir. 2010), *quoting Davidson v. Scully*, 172 F.Supp.2d 458, 461 (S.D.N.Y. 2001) (emphasis added).  In *National Union*, the Second Circuit upheld a district court's denial of a motion to reconsider because it raised only arguments "that could have, and should have, been raised earlier."  *Id.*

This principle is well-established in this District.  "[The movant] should have made this argument in its Opposition.  It did not.  Consequently, this argument provides the Court with no basis to reconsider its prior decision."  *El Badrawi v. Dep't of Homeland Sec.*, No. 07-cv-1074, 2009 WL 2913246, at *2 (D.Conn. Sept. 4, 2009).  *See also Rotbergs v. Guerrera*, No. 10-CV-1423, 2012 WL 1204729, at *8 (D.Conn. Apr. 11, 2012); *Packer v. S.N. Servicing Corp.*, 250 F.R.D. 108, 112 (D. Conn. 2008); *Rose v. Panolam Indus. Intern., Inc.*, 301 F.Supp.2d 239, 247 (D.Conn. 2004).

Defendant had ample opportunity to inform the Court of this issue and to brief it.  On June 3, 2010, Plaintiff moved to place the SSA's May 2010 Award in her favor on the administrative

4

record. This Court's 2010 Ruling was not issued until August 16, 2010. Because Defendant became aware of the May 2010 Award no later than June 3, 2010, it had at least ten weeks in which to supplement its briefing to address the setoff issue. It failed to do so. In this case, Defendant did not discover something new (such as new evidence or new law) after the Court's August 2010 Ruling was issued. Defendant could not plausibly assert that prior to that time, it was unaware of the SSA's May 2010 Award. On the contrary, on June 23, 2010, Defendant filed a brief in opposition to Plaintiff's motion to place the May 2010 Award on the administrative record.

Defendant's assertions on this issue are misleading. Defendant states that "throughout the whole course of briefing the parties' respective motions for judgment on the administrative record, the information available to Defendant's counsel was that Plaintiff had been *denied* Social Security benefits." Defendant Life Insurance Company of North America's Reply in Further Support of Its Motion to Reconsider the Court's Ruling on Cross-Motions for Judgment on the Administrative Record ("Recon. Reply Memo.") [Doc. 62] at 3 (emphasis in original). While that statement may be technically true, depending on how one defines "the whole course of briefing," it misleadingly implies that Defendant was unaware of the SSA's May 2010 Award until after the Court's August 2010 Ruling was issued. Defendant's assertion that it was not required to plead this issue as a defense, *id.*, ignores the point at issue. A party is expected to make its arguments to the Court before, rather than after, the Court issues its ruling. Likewise, when Defendant asserts that "nothing in the Complaint or other pleadings put LINA on notice that a reduction of Other Income Benefits needed to be raised here," Recon. Reply Memo. at 4, it fails to mention that Plaintiff's motion to place the May 2010 Award on the administrative record *did* put Defendant on notice that the Other Income Benefits issue needed to be addressed. The situation here differs from the situation in *Paese*

5

*v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 447 n. 4 (2d Cir. 2006), which Defendant cites for the principle that it cannot be penalized for a defense that it did know that it had.  In its decision in *Paese*, the Second Circuit did two things at once:  it announced the existence of an entirely new affirmative defense, and it held that the defendant was excused for its failure to assert that defense. The defendant in *Paese* could not have not known of the relevant change of law in advance of the ruling.

Likewise, Defendant is wide of the mark when it asserts that "none of the parties or the Court knew the amount of Plaintiff's Social Security disability benefits until after the Court issued its Ruling."  Recon. Reply Memo. at 4.  Even if had not been possible for Defendant to determine the amount of the May 2010 Award, it could still have argued to the Court, in a supplemental brief, that the LTD award should be reduced by whatever amount the SSA had awarded.  Moreover, Defendant does not explain why it failed to determine the amount of the benefits until August 30, 2010, when Plaintiff informed it of the amount.  *Id.* at 5.  Defendant is represented in this matter by counsel. During the ten-week period in question, Defendant had ample time to determine that amount, whether by inquiring of Plaintiff's counsel or otherwise.  It apparently made no effort to do so.

The rule enforced here does not represent a petty concern with procedural trifles.  The Court relies on the parties to bring to its attention matters that bear on the ruling it must make and the remedies, if any, that it must order.  Economy in the use of judicial and litigants' resources would be ill-served by a rule that would enable parties to hold some of their arguments in reserve for possible use after a ruling is issued.  *See, e.g., Wright v. Duncan*, No. 02-CV-508, 2008 WL 8432363, at *5 (N.D.N.Y. April 15, 2008) (parties may not keep arguments in reserve while a magistrate judge spends a significant amount of time and effort preparing a Report and

6

Recommendation and then "shift gears" based on the magistrate judge's ruling).

Defendant's motion to reduce the Court's computation of LTD benefits by the amount of SSA payments is DENIED as untimely made.

**B.      The Medical-Insurance Award**

The second issue raised in Defendant's Motion to Reconsider, regarding the award of reimbursement for medical-insurance costs, is moot.  Plaintiff has abandoned her entitlement to this category of damages.

In the 2010 Ruling, the Court found that Plaintiff was entitled to reimbursement for the additional medical-insurance premiums she was forced to pay when Defendant's wrongful denial of LTD benefits caused her to lose medical coverage from UBS as well.  77 F.Supp.2d at 88. Specifically, it held that Plaintiff was entitled to reimbursement for the difference between what she paid for medical coverage and what she would have paid for coverage through UBS, if UBS coverage was less expensive.  However, the Court observed that Plaintiff had not adequately documented the losses for which she sought reimbursement.   The Court therefore issued the following order:  "If she wishes to pursue reimbursement for such costs, Plaintiff is directed to submit adequate documentation on or before October 1, 2010, unless the parties are able to stipulate to the amount of the award for Plaintiff's medical costs."  *Id.*  This deadline was later extended to October 15, 2010 [Doc. 51].

Neither such documentation nor a stipulation as to the amount of the award has ever been filed.  Thus, Plaintiff has abandoned her claim for damages arising from reimbursement for medical-insurance costs.

7

## II.    PLAINTIFF'S MOTION FOR CONTEMPT

Plaintiff alleges that Defendant failed to comply with the Court's order to pay her $79,500 by August 31, 2010, and when it did pay on September 9, 2010, sent her counsel a check for $34,579.67.   Memorandum of Law in Support of Plaintiff's Rule 70 Motion for Contempt ("Contempt Supp. Memo.") [Doc. 52] at 2.   Defendant agrees that its initial payment was only $34,579.67, and asserts that it issued a second check to Plaintiff for $2,371.27.   Defendant Life Insurance Company of North America's Memorandum of Law in Opposition to Plaintiff's Motion for Contempt ("Contempt Opp. Memo.") [Doc. 61] at 7.

If a party fails to comply with a judgment, the Court may hold the disobedient party in contempt.   Fed. R. Civ. Pro. 70(b).   To establish contempt, a movant must show that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.   *Perez v. Danbury Hosp.*, 347 F.3d 419, 423-24 (2d Cir. 2003).   Plaintiff has made those showings.   The Judgment is clear and unambiguous:   "The defendant is ordered to pay long term disability benefits to the plaintiff in the amount of $79,500.00 by August 31, 2010."   Defendant does not deny that it failed to comply.   Contempt Opp. Memo. at 7.   While Defendant asserts that it made diligent efforts to comply, it means thereby not that it made diligent efforts to comply with the Court's order, but that it made diligent efforts to pay the amount of LTD benefits that, in its own view, was appropriate.   Contempt Opp. Memo. at 6-8.

Defendant argues that it was not obliged to obey the Court's order because it filed a timely motion to reconsider.   Contempt Opp. Memo. at 5-6.   Defendant provides no authority for this

8

proposition.  In general, a party must comply with any court order, even one later determined to be unconstitutional.  *Shady Records, Inc. v. Source Enters., Inc.*, 371 F.Supp.2d 394, 397 (S.D.N.Y. 2005).  The burden is on Defendant to show that the filing of a motion to reconsider justifies failure to comply.  It has not done so.

Authority on this issue is scarce, but such authority as there is contradicts Defendant's position.  "[The defendant's] obligation to comply is not excused by the filing of the motions for reconsideration of the order ...."  *Creative Solutions Group, Inc. v. Pentzer Corp.*, 119 F.R.D. 443, 444 (D.Mass. 2001).  "The motion for reconsideration [the petitioner] did file did not automatically suspend the time within which he was required to comply with the court's screening order."  *McCormick v. Six*, No. 10-3168-SAC, 2011 WL 4591884, at *6 (D.Kan. Sept. 30, 2011).  "The filing of the motion for reconsideration did not excuse the Judgment Debtors' compliance with the April 15 Order."  *In re Heritage Org., LLC*, Bankr. No. 04-35574-BJH-11, 2010 WL 3516174, at *2 n. 8 (Bankr. N.D. Tex. Sept. 3, 2010).  Likewise, the court in *U.S. v. Ottman*, No. 7:05-cr-10, 2008 WL 4371975, at *1 n. 1 (M.D.Ga. Sept. 22, 2008), held that the filing of a motion to reconsider did not act as a stay of an order.  *See also* 11 Charles Alan Wright, Arthur R. Miller and Mary J. Kane, *Federal Practice & Procedure* § 2903 (2d ed. 1995) ("A posttrial motion, seeking a new trial or some other similar kind of relief, does not stay the judgment").

The proper course for Defendant was to seek a stay of the Judgment during the pendency of the Motion to Reconsider.  "At the very least, defendant was obligated to seek a stay of its obligation to comply with the Order compelling discovery [during the pendency of its motions for reconsideration] ... A separate motion to stay or for a protective order should have been filed."  *Creative Solutions Group, Inc. v. Pentzer Corp.*, 119 F.R.D. 443, 444 (D.Mass. 2001).  Parties have

9

done this with success.   A party successfully obtained a stay of judgment during the pendency of a motion to reconsider in *Brothers Trading Co., Inc. v. MRI Distributor, Inc.*, No. 95-CV-4877, 2001 WL 64751, at *1 (E.D.N.Y. Jan. 19, 2001), and a stay of entry of judgment during the pendency of a motion to reconsider in *Chemical Overseas Holdings, Inc. v. Republica Oriental de Uruguay*, No. 05-CIV-260, 2005 WL 1123897, at *1 (S.D.N.Y. May 10, 2005).

Instead, Defendant engaged in self-help, placing itself in contempt of court.   Unfortunately, Plaintiff, in her Motion for Contempt and supporting briefs, did not tell the Court what remedy she seeks.   Plaintiff stated simply that "[a]n order under Rule 70 should issue."   Contempt Supp. Memo. at 3.   Several remedies are available for civil contempt under Rule 70 and the inherent power of the Court.   The Court may, after taking evidence of the movant's loss from the contempt, impose on the contemnor a fine payable to the movant, in an amount sufficient to compensate the movant for its loss. *Paramedic Electromedicina Comercial, LTDA v. G.E. Medical Sys. Info. Techs.*, 369 F.3d 645, 658 (2d Cir. 2004).   Such an award may include interest on the money wrongfully withheld. *Constr. Tech., Inc. v. Cybermation, Inc.*, No. 91-Civ-7474, 1997 WL 282256, at *1 (S.D.N.Y. May 27, 1997).   The Court may, after considering the character and magnitude of the harm threatened by the contumacy, the probable effectiveness of the sanction in bringing about compliance, and the contemnor's ability to pay, impose a coercive fine payable into court if the contemnor fails to purge itself of the contempt. *Id.* at 657-58; *N.Y. State Nat'l Org. of Women v. Terry*, 159 F.3d 86, 94 (2d Cir. 1998).   The Court may also grant Plaintiff her attorney's fees and costs for bringing the Motion for Contempt. *Terry* at 96.

The Court holds Defendant in contempt, and finds that a suitable sanction in this instance is the payment of interest to Plaintiff to compensate her for her loss resulting from the contempt.

10

Defendant must pay to Plaintiff 10% interest, compounded annually, on the amount of money wrongfully withheld, for the period from August 31, 2010 to the date of the payment.  The amount wrongfully withheld is $79,500 minus the amount of payments of back benefits that Defendant made to Plaintiff in August and September 2010, which is $42,549.06.  The balance of $36,950.94 ($79,500 - $42,549.06) represents the amount wrongfully withheld by Defendant from Plaintiff, to which the 10% interest rate attaches.  While this interest rate is in excess of the statutory rate of post-judgment interest and the rates in some awards of pre-judgment interest, the difference reflects the fact that this award is a sanction for contempt of Court.

III.    **PLAINTIFF'S APPLICATION FOR ATTORNEY'S FEES**

In order to place Plaintiff's application for attorney's fees, which Defendant would be required to pay, fully in context, it is useful to restate the procedural history of the case.

A.    **Procedural History**

This action arises out of an alleged violation of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").  Plaintiff Paige Fairbaugh was a participant in a welfare benefit Plan issued by Defendant Life Insurance Company of North America ("LINA") to UBS, Plaintiff's former employer.  Plaintiff was diagnosed with multiple sclerosis ("MS") and exhibited symptoms of that crippling disease.  LINA paid Plaintiff long term disability benefits under the Plan from November 15, 2008 until May 20, 2009, when it terminated the benefits.  Plaintiff filed this action to complain that the termination violated ERISA.  The parties filed cross-motions for Judgment on the Administrative Record.  In an opinion reported at 737 F.Supp.2d 68 (D. Conn. 2010) ("*Fairbaugh I*"), familiarity with which is assumed, the Court granted

11

Plaintiff's motion and denied that of Defendant.

On August 17, 2010, the Clerk entered Judgment [Doc. 45] in favor of Plaintiff Fairbaugh and against Defendant LINA.  The Judgment ordered Defendant "to pay long term disability benefits to Plaintiff in the amount of $79,500 by August 31, 2010."  The Judgment also recited:  "The Court will enter a Supplemental Judgment, if necessary, in respect of any outstanding issues regarding fees, costs and interest."  Those provisions in the Judgment were included in compliance with the Court's opinion and directions in *Fairbaugh I*, 737 F.Supp.2d at 90, where the Court held that Plaintiff was entitled to immediate payment of $5,300 per month in long term disability benefits "that she should have been receiving from May 20, 2009 though the date of this order, which is approximately fifteen (15) months," a formula resulting in the $79,500 payment Defendant was directed to make "on or before August 31, 2010, rather than awaiting resolution of the outstanding issues of Plaintiff's medical costs, attorney's fees and costs, and prejudgment interest, regarding which a supplemental order and judgment will issue once they have been resolved."

No appeal was taken from this Judgment.

### B.    Applications for Fees and the Objections to Them

From the inception of the case, Plaintiff has been represented by the Bridgeport, Connecticut law firm of Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. ("the Durant Firm"), which describes itself as specializing in "labor and employment law, including employee benefits." Affidavit of Loraine M. Cortese-Costa, a Durant Firm director [Doc. 55] at 1.

The Durant Firm's first fee application [Doc. 55] was filed on October 15, 2010.  It sought attorneys' fees and costs totaling $52,239.13.  Ms. Cortese-Costa's affidavit, sworn to on that date,

recites that the staff on the case consisted of herself as the partner; two associates, Rachel Volkman Kushel and Sarah R. Skubas; and unnamed paralegals. According to that affidavit, Ms. Cortese-Costa received her law degree in 1986. Her hourly rate is $300. She billed a total of 114.75 hours on the case through October 13, 2010. Ms. Kushel had been practicing law for 10 years. Her hourly rate is $240. She billed 33.75 hours on the case during that period. Ms. Skubas had been practicing law for three years. Her hourly rate is $160. She billed 25.75 hours on the case during that period. Paralegals at the Firm are billed at a rate of $140. They billed 16.75 hours on the case during that period.

According to the Cortese-Costa October 15, 2010 affidavit [Doc. 55], the total time billed at these hourly rates totals $48,870 in fees though October 13, 2010, to which the Durant Firm adds $940.13 in costs paid by Plaintiff. The Firm subtracted about $1,270 in professional time as a courtesy to the client, and also subtracted $1,050 in unrecoverable fees related to the appeal process. The Firm then added $4,717.98 to the fee balance as "a 10% lodestar upward adjustment, based upon the completely successful result obtained for Plaintiff." *Id*. at ¶ 22. These calculations result in the claimed attorneys' fees and costs in the total amount of $52,239.13.

Defendant filed a brief in opposition to this application for attorneys' fees [Doc. 63] which argues that for a variety of reasons, the Durant Firm's fee should be reduced from $52,239.13 to $21,884.48. To summarize, Defendant contends that the claimed lawyers' time should "be reduced across the board by 40 percent" in order to "properly take into account the excessive and duplicative amount of time spent on this matter by Plaintiffs' attorneys." [Doc. 63] at 3-4. Defendant's overall position is that the claimed fees and expenses are "unreasonable" because they are "(1) excessive based on the simple, discrete tasks that are the basis for the time expended; (2) for work that was

13

unnecessary; (3) unsupported by vague time records that do not adequately explain how these fees are related to the successful components of the litigation; and; (4) for time devoted to claims that are unrelated to the claims on which Fairbaugh prevailed." *Id*. at 2-3. Each of these perceived defects is discussed in detail, and suggested amounts of fee reduction assigned to them. In addition, Defendant contends that a lodestar upward adjustment is not justified by the circumstances of the case; and that a further reduction of fees is required because the Durant Firm's submissions "failed to establish that the rates charged are consistent with reasonable rates charged in this market for this type of legal work." *Id*. at 2 n.3. The cumulative effect of these contentions is to reduce the total amount of Plaintiff's application for attorneys' fees and costs by $30,354.65 ($52,239.13 - $21,884.48 = $30,354.65), or 58%.

Plaintiff responded to these belittling objections with a reply brief, exhibits and copies of unreported court decisions [Doc. 65]. These submissions defend the amount of the Durant Firm's initial application, and increase the total amount for requested fees and costs from $52,239.13 to $59,390.80. *Id.* at 8. As often occurs in cases of this nature, these two briefs of counsel bristle with counsel's *ad hominem* reflections on each other's professional conduct, combining the light they shed (helpful to the Court) with heat (less so).

In support of the applications, the Durant Firm submitted as part of Docs. 55 and 65 copies of itemized professional services bills which manifestly were not created contemporaneously with the legal services they described. In an Order dated March 30, 2012 [Doc. 69], the Court pointed out that in that regard, the application did not comply with Second Circuit authority. The Order cited some of the leading cases, and gave Plaintiff additional time to submit affidavits and submissions "that comply with the requirements of *Carey*, *Cruz*, and *Handschu."* (citations omitted).

14

The Durant Firm responded with a "Supplemental Application Re: Attorneys' Fees" [Doc. 70] which submitted additional affidavits and documents describing the Firm's record keeping procedures with respect to recording and billing time on cases.  That filing generated further briefs by Defendant [Doc. 71] opposing Plaintiff's fee application and by Plaintiff supporting it [Doc. 72] which reprise the parties' earlier arguments.

### C.      Discussion

Fairbaugh's applications for attorney's fees, and LINA's opposition to them, give rise to a number of issues which will be separately addressed.

### 1.      *Plaintiff's Entitlement to Attorney's Fees*

The fee applications at bar are based upon a fee-shifting provision in ERISA, 29 U.S.C. § 1132(g)(1), which provides:

> In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

ERISA thus differs from those federal fee-shifting statutes that allow district courts to grant attorney's fees to a "prevailing party."  In *Hardt v. Reliance Standard Life Insurance Co.*, 130 S.Ct. 2149 (2010), the Supreme Court held that "a fee claimant need not be a 'prevailing party' to be eligible for an attorney's fee award under § 1132(g)(1)." *Id*. at 2156. Instead, "a fees claimant must show some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1)." *Id*. at 2158 (citation and internal quotation marks omitted).  This is a less demanding standard, and Defendant does not contend Plaintiff fails to meet it; nor could Defendant do so,

having terminated Plaintiff's long term disability benefits until this Court directed that those benefits "be reinstated immediately." *Fairbaugh I*, 737 F.Supp.2d at 90.

### 2.   *Enhancement of the Lodestar Amount*

A second recent Supreme Court case, *Perdue v. Kenny A.*, 130 S.Ct. 1662 (2010), precludes the Durant Firm's claim, asserted in [Doc. 55], for "a 10% lodestar upward adjustment, based upon the completely successful result obtained for Plaintiff." The Firm, not without reason, congratulates itself upon self-perceived excellence in performance and results. The "lodestar" fee amount, calculated by "the number of hours worked multiplied by the prevailing hourly rates," has "become the guiding light  of our fee-shifting jurisprudence." *Perdue*, 130 S.Ct. at 1669, 1672. *Perdue* involved a fee application by counsel for a class of 3,000 children in the Georgia foster-care system who obtained a favorable consent decree against state officials in an action alleging that the defendants, in their administration of the system, violated the children's federal and state constitutional and statutory rights. The District Court enhanced the lodestar amount by 75%, citing class counsel's superior performance and the successful result.

The Supreme Court began its decision by saying: "This case presents the question whether the calculation of an attorney's fee, under the federal fee-shifting statutes, based on the 'lodestar,' . . . may be increased due to superior performance and results." *Id*. at 1669. The Court remanded the case to the District Court because "the District Court did not provide proper justification for the large enhancement that it awarded." *Id.* at 1675. A trial judge's discretion to award attorney's fees "is not unlimited," the Supreme Court reasoned, and "[i]t is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination, including any award of an

16

enhancement." *Id*. at 1676.  Justice Alito's opinion for the Court in *Perdue* is replete with the Court's specific instructions to trial judges, including this one:

> [S]uperior results are relevant only to the extent it can be shown that they are the result of superior attorney performance.  Thus, we need only consider whether superior attorney performance can justify an enhancement.  And in light of the principles derived from our prior cases, we inquire whether there are circumstances in which superior attorney performance is not adequately taken into account in the lodestar calculation.  We conclude that there are a few such circumstances but that these circumstances are indeed rare and exceptional, and require specific evidence that the lodestar fee would not have been adequate to attract competent counsel.

130 S.Ct. at 1674 (citation and internal quotation marks omitted).  To emphasize the point, Justice Kennedy said in his concurrence: "It is proper for the Court today to reject the proposition that all enhancements are barred; still, it must be understood that extraordinary cases are presented only in the rarest circumstances."  *Id*. at 1677.

That conclusion follows from the Court's comprehensive analysis in *Perdue,*[1] which begins with the proposition that fees awarded pursuant to fee-shifting statutes must be "reasonable," defined as "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," 130 S.Ct. at 1672, a broadly stated concept equally applicable to ERISA cases.  The lodestar method "yields a fee that is presumptively sufficient to obtain this objective," since "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee," and "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation," with the result that "the quality of an attorney's performance generally should not be used to adjust

---

[1]  Neither party in the case at bar cited *Perdue* in the lengthy briefs.

17

the lodestar because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate." *Id*. at 1672-73 (citations and internal quotation marks omitted).

In the case at bar, the Durant Firm's justification for a lodestar enhancement fails to pass muster under *Perdue v. Kenny A.* because it is limited to self-praise of performance and relies principally upon the Second Circuit's 30-year old opinion in *Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983), which the Firm characterizes as "affirming an upward adjustment for high quality of work and complexity of litigation." Plaintiff's Reply Brief [Doc. 65] at 8. Those are precisely the criteria which *Perdue* holds are insufficient, standing alone, to justify a lodestar enhancement. *Perdue* precludes this Court from enhancing the lodestar amount unless, in *Perdue*'s words, the Durant Firm furnished "specific evidence that the lodestar fee would not have been adequate to attract competent counsel." No such evidence is offered, and the proposition seems inherently implausible. Nor is it unfair to evaluate the application at bar by the standards articulated in 2010 by the Supreme Court in *Perdue*, since that opinion reveals that those standards are derived from the Court's prior jurisprudence.

For these reasons, the lodestar fee of Plaintiff's counsel will not be enhanced.

### 3.   *Prevailing Market Rates in the Relevant Legal Community*

In their brief opposing Plaintiff's fee application [Doc. 63], Defendant's counsel say in footnote 3 at page 2: "While plaintiff's counsel has submitted the Affidavit of Loraine M. Cortese-Costa in an attempt to establish the time billed and rates charged by counsel, Plaintiff's counsel has failed to establish that the rates charged are consistent with reasonable rates charged in this market

18

for this type of legal work," by which Defendant presumably means legal work necessary to redress an insurance company's arbitrary and wrongful refusal to pay disability benefits, of the sort employed by the Defendant at bar. Defendant contends that this failure has consequences: "Plaintiff's fee award should, therefore, be further reduced for this reason." *Id.*

Plaintiff's reply brief, [Doc. 65] at 4, begins its response to this criticism by saying that "Defendant drops a footnote" to assert it. If Plaintiff intends to belittle Defendant's contention because it is found in a footnote, the suggestion is old-fashioned. In the days of Holmes, Cardozo and Brandeis, the Supreme Court's decisions on even the most momentous issues may have generally been innocent of and uncluttered by footnotes. But no serious contemporary student of the Court's jurisprudence would disregard what frequently appears at length in the footnotes of this era's majority or dissenting opinions. The footnote has become a hallmark of modern legal writing, in the opinions of lower courts, learned academic papers, even the briefs of counsel. The question is whether this criticism by Defendant of Plaintiff's fee application, for failure to deal with market rates, has substance.

As authority for its criticism, Defendant cites *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The designated page in *Hensley* does not address the market issue directly, but the Supreme Court did so explicitly in the later case of *Blum v. Stenson*, 465 U.S. 886 (1984), involving an application under 42 U.S.C. § 1988, the fee-shifting provision of the civil rights statutes, where the prevailing plaintiffs were represented by the Legal Aid Society, a nonprofit law office. The Court held: "The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." 465 U.S. at 895. At that point in the

19

opinion the Court dropped footnote 11, which reads in part:

> In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community *for similar services* by lawyers of reasonably comparable skill, experience, and reputation. A rate determined this way is normally deemed to be reasonable, and is referred to – for convenience – as the *prevailing market rate*.

(emphases added).

The effect of *Blum*'s market rate requirement upon a fee award in an ERISA case is strikingly illustrated by *Blajei v. Sedgwick Claims Management Services, Inc.*, Civil No. 09-13232, 2010 WL 3855239 (E.D.Mich. Sept. 28, 2010). The defendant insurance company had terminated plaintiff's disability benefits. The district court vacated that termination and remanded the case to defendant "for full and fair review." 2010 WL 3855239, at *1. Plaintiff thereupon moved for attorney's fees and costs, which defendant resisted on the ground that it was premature, a contention the court rejected because plaintiff had achieved "some degree of success on the merits," *id*. at *2 (citing and quoting *Hardt*, *supra*). The court then turned to plaintiff's fee application, and began with the observation: "In determining whether a fee applicant's requested hourly rate is appropriate, a district court must 'assess the prevailing market in the relevant community" (citing and quoting *Blum*, *supra*). The application by plaintiff's counsel was deficient because, while describing how long the attorneys had been practicing and their requested hourly rates, "Plaintiff's Motion and counsel's affidavits fail to provide any information that would aid the Court in determining the prevailing market rate *for competent ERISA counsel in southeastern Michigan*." 2010 WL 3855239, at *11.

20

That was a fatal defect because, as the court explained with respect to ERISA and other federal fee-shifting statutes:

> The statutes use the words "reasonable" fees, not "liberal" fees. Such fees are different from the prices charged well-to-do clients by the most noted lawyers and renowned law firms in a region. Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate.

*Id*., at *10 (citation and internal quotation marks omitted). It was not sufficient for applying counsel to simply aver that they "have been practicing ERISA law for a number of years, without specifying the number of years or cases litigated, or whether 'ERISA law' encompasses cases *similar to Plaintiff's*." *Id*., at 11 (emphasis added). The district court in *Blajei*, confronted with this inadequate application, "independently researched and reviewed a number of cases where the court awarded attorney's fees *in an ERISA denial-of-benefits case*," *id*. (emphasis added), and concluded that one attorney's requested rate was high.

*Blum* declares in principle the requirement that a fee applicant identify the specific legal market within which an attorney's hourly rate is claimed to be reasonable. *Blajei* illustrates how that principle works in practice. In the case at bar, the Durant Firm ignores the principle and departs from the practice. The attorney's affidavit accompanying Plaintiff's first application [Doc. 55] identifies three lawyers who worked on the case: the affiant, a partner (Cortese-Costas) and two associates (Kushel and Skubas); states how long each has been practicing law; and gives the current hourly rate of each. The partner's affidavit also says that the Durant Firm "specializes in labor and unemployment law, including employee benefits." [Doc.55] at ¶ 2. That is the total of Plaintiff's

21

initial showing on this issue.  That generalized description tells the Court nothing about the amounts of fees commonly paid in Connecticut for prosecuting ERISA denial-of-benefit cases.  And even if the partner's affidavit had undertaken that exercise, standing alone it would be inadequate for the task.  In *Blum* the Supreme Court explicitly stated that a fee applicant must "produce satisfactory evidence – *in addition to the attorney's own affidavits* – that the requested rates are in line with those prevailing in the community for similar services," 465 U.S. at 985 n. 11 (emphasis added).

Responding to Defendant's footnoted but nonetheless substantive criticism on this point, Plaintiff's reply brief [Doc. 65] does no more than collect fee-shifting cases in which Connecticut lawyers charged and were allowed hourly rates higher than those claimed by the Durant Firm in this case.  On the authority of those cases, Plaintiff argues: "Moreover, it cannot be doubted that Plaintiff's counsel rates are not only reasonable *in this market*, they are in fact *lower*," *id.*  at 4 (first emphasis added).  Plaintiff characterizes Magistrate Judge Fitzsimmons' opinion in *Home Funding Group, L.L.C. v. Kochmann*, No. 3:06-cv-1234, 2008 WL 4298325 (D. Conn. Sept. 18, 2008), as "surveying *prevailing market rates* and determining $320 and $280 as appropriate rates for partners and associates respectively." *Id*. at 5 (emphasis added).  But none of the variety of Connecticut civil cases Plaintiff cites, or Judge Fitzsimmons collects in her comprehensive opinion,[2] involves an action to restore ERISA benefits wrongfully terminated by an insurance company.  Plaintiff's broad definition of "prevailing market" is precluded by *Blum* and its progeny.  As the trial judge in *Blajei* sensibly observed, an established attorney's relatively high hourly rate may be acceptable generally, but not in the particular and specialized field of practice forming the boundaries of a fee application.

---

[2]  See *Home Funding*, 2008 WL 4298325, at *8.

*Blajei* also holds, with equal good sense, that particular sub-specialities of legal practice (ERISA benefit litigation) trump for fee application purposes the more general concept of labor law.

It follows that Plaintiff's fee application is not adequately supported under controlling authority.  The consequence of that failure remains to be decided.  It need not be extreme.  The cases of differing nature that the Durant Firm cites do suggest that their requested hourly rates in this case are not exorbitant.  But the Court cannot overlook a failure to comply with explicit Supreme Court case law, particularly on the part of a firm professing itself to be expert in the specific legal practice and community involved.  One cannot exclude the possibility that within Connecticut, ERISA benefits-termination litigation commands lesser fees for plaintiffs' counsel than other areas of the law.  Precisely for the purpose of laying that possibility to rest, the Supreme Court in *Blum* requires fee applicants to prove the community hourly market rate "*for similar services*."

While I admire the innovation and energy of my Eastern District of Michigan colleague in *Blajei*, I decline to conduct independent research into fees awarded in Connecticut for this sort of ERISA case.  That is what the Durant Firm should have done, and disregarding the omission entirely would not be appropriate.  In the exercise of my discretion, the lodestar amount of the fees for Plaintiff's attorneys will be reduced by 5 %.

### 3.   *Other Issues*

LINA's main brief in opposition to Fairbaugh's attorney's fee application [Doc. 63] rounds up the usual suspects: excessive time spent on simple tasks, unnecessary work, vague time records, time devoted to claims on which Fairbaugh failed.  These assertions are routinely made by parties seeking to avoid or minimize paying the fees of an adversary's attorneys.  Where such a criticism

of a fee is just and persuasively demonstrated, cases generally hold that the fee may reduced to reflect with precision the inflationary effect of the condemned conduct upon the total fee.

In the case at bar, LINA makes those calculations with respect to each fault it purports to detect in the Durant Firm's fees. However, LINA takes its fee opposition one step further. It says that the combined effect of these particular fee flaws justifies a 40% reduction in the total fee, which is then superimposed upon or added to the particular reductions computed with respect to each perceived flaw, with the result that the Durant Firm's fees are reduced by 58%. Not surprisingly, LINA cites no case which approves this unapologetic exercise in double-dipping.

LINA's shotgun blast against the Durant Firm's fee structure invites, nay requires, consideration of the wrongful manner in which this insurance company treated Paige Fairbaugh, the multiple sclerosis-stricken and vulnerable beneficiary of the disability plan LINA issued, and the legal steps Ms. Fairbaugh had to take to redress that wrong. For the reasons stated in *Fairbaugh I* and not here repeated, the Court concluded that LINA acted in an arbitrary and capricious manner when it began paying Fairbaugh disability benefits and then abruptly terminated them. The Court's award of Fairbaugh's attorney's fees was intended, *inter alia,* to "have the effect of deterring Defendant and others similarly situated from arbitrarily terminating the benefits of other disability plan participants in like circumstances." *Fairbaugh I*, 737 F.Supp.2d at 89. It comes with a certain lack of grace for the company to quarrel with so many aspects of the Durant Firm's fee.

Of course, the case turns on questions of law, not of grace: subjects not frequently mistaken for each other. One party's dishonorable conduct does not grant a license to the other party's attorneys to pad their bills. However, after consideration I conclude that Defendant's criticisms of

24

Plaintiff's attorney's fee do not, taken separately or in combination, demonstrate that the fee should be reduced in order to be "reasonable," the legal touchstone.

Multiple sclerosis, the disease for which Fairbaugh sought and initially received disability benefits under the LINA Plan, is as complex an affliction as it is cruel. In the case at bar, the parties cross-moved for summary judgment on the administrative record, a 970-page compendium of documents Defendant filed under seal. *Fairbaugh I*, 737 F.Supp.2d at 72 and 72 n. 2. That record is replete with reports of neurologists, treating and non-treating; neuropsychological evaluations performed by a Ph.D at Gaylord Hospital, a renowned rehabilitative facility; and a non-treating neurosurgeon. The Court reviewed that record in *Fairbaugh I*, at 737 F.Supp.2d 72-77. For present purposes, it is sufficient to say that Plaintiff's entitlement *vel non* to disability benefits under Defendant's Plan presented medical, vocational and legal issues which had to be viewed not only singly but in relation to each other. That complex of issues arose when Defendant terminated Plaintiff's benefits in their entirety and refused to reconsider the matter.

In order to restore Fairbaugh's benefits, the Durant Firm had to reweave that web of factors and demonstrate that LINA's termination of benefits was arbitrary and capricious, and thus illegal. This Court's ruling in *Fairbaugh I* recounts the manner in which these attorneys accomplished that task. In order to achieve it, a partner (Cortese-Costa) worked 114.75 billable hours on the case; two associates worked a total of 59.5 hours (Kushel 33.75 hours and Skubas 25.75 hours); and paralegals worked 16.75 hours. Contrary to Defendant's contentions in [Doc. 63] at 3 ("the amount of time spent by Plaintiff's counsel on this matter is patently excessive" and the Durant Firm "apparently seeks to treat its application for fees as a full employment act for its staff"), the partner on a case of this demanding nature cannot reasonably be criticized for enlisting the talents of associates, and the

25

total amount of lawyers' time seems to the Court to be patently reasonable.

LINA's opposition papers seek to minimize the legal efforts its termination of Fairbaugh's benefits caused her attorneys in order to rectify that wrong. Defendant argues that "the amount of fees sought here is excessive because this case involved *no discovery*, as the matter was circumscribed to the Administrative Record, and was ***decided entirely on briefing papers*** submitted by the parties." [Doc. 63] at 3 (emphases in original). These descriptions are accurate as far as they go, but they do not go very far. True, there was no trial or evidentiary hearing before the Court; but the amount of attorneys' efforts required by summary judgment practice varies with the nature of the case. An unpaid lender may recover summary judgment on a borrower's one-page promissory note without fielding a legal team of litigation partner, associates and paralegals, but that does not compare with the attorney resources a disability policy beneficiary may require when confronted with an insurance company's refusal to pay contracted-for benefits, purportedly based upon a 970-page, company-generated medical, vocational and legal administrative record.

Defendant's remaining objections do not require extended discussion. Defendant quarrels with Plaintiff's characterization of her attorneys' efforts as "completely successful," and contends that the fee should be reduced for partial lack of success. [Doc. 63] at 9-11. In the seminal case of *Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983), the Supreme Court said that "[i]f, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount," and added: "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." In a strained effort to show that Fairbaugh's attorneys achieved only a "limited success," LINA's brief argues first that "Plaintiff lost

26

on the critical issue of the standard of review applicable to LINA's determination" of disability.  *Id.* at 10.  This is, with all due respect, a silly argument.  It is true that Plaintiff contended initially for a *de novo* review by the Court rather than the arbitrary and capricious standard the Court applied, but Plaintiffs' attorneys then demonstrated that Defendant's termination of benefits was indeed arbitrary and capricious, thereby achieving for Plaintiff complete success on her core claim that payment of her benefits should resume.  To downgrade Plaintiff's success on that core claim because of her counsel's initial embrace of the wrong standard of review would be as inequitable as giving an unfavorable review to a magnificently staged, sung, acted and played performance of Gounod's *Faust* because the first clarinet muffed his entrance during the overture.

Defendant also proclaims Plaintiff's lack of success with respect to satellite claims for waiver of life insurance premiums and medical insurance premium reimbursements.  In contrast to Plaintiff's core claim, the amounts involved in these lesser claims are *de minimis*.  Any lack of success on Plaintiff's part with respect to them cannot in equity transform Plaintiff's litigation success from total to limited.

Lastly, Defendant contends that the Durant Firm's fee "should be reduced because it is unreasonable to conclude that a paying client would be willing to pay more to her attorneys in legal fees than the amount which she recovered in the litigation." [Doc. 63] at 11.  The surface logic of this contention was explicitly rejected by the Second Circuit in *Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir. 1998).  The plaintiff in a civil rights case appealed from District Judge Martin's order "awarding attorney's fees in the amount of $79,072.50, exactly one-half of her recovery at trial on her pregnancy discrimination and retaliation claims against her employer, Tiffany & Co."  166 F.3d at 423.  Following that favorable result, the plaintiff applied for an award of attorney's fees.  Judge

Martin   "arrived at a lodestar amount of $124,645.18," but instead of awarding a fee in that amount, "the district court elected to craft what it termed a 'billing judgment' approach," under which "an attorney's requested fee would be judged 'reasonable' if it were rationally related to the monetary recovery that the attorney could have anticipated *ex ante*."  *Id*. at 425.

Thus, Judge Martin keyed the amount of an awardable fee directly to the amount of the plaintiff's recovery, limiting the first to a percentage of the second:  a formula Defendant suggests in the case at bar.  But the Second Circuit rejected that approach in *Quaratino*, reasoning:

> this approach conflicts with the legislative intent and rationales of the fee-shifting statute.  Congress enacted fee-shifting in civil rights litigation precisely because the expected monetary recovery in many cases was too small to attract effective legal representation. . . . We believe the lodestar analysis, as developed and refined in the decade and a half of jurisprudence beginning with *Hensley*, is a flexible mechanism within whose parameters district courts should calculate the prevailing plaintiff's 'reasonable' fee.  We decline the district court's invitation to abandon that framework in favor of a billing judgment rule.

166 F.3d at 426 (citations omitted).

Subsequent to *Quaratino*, in *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2007), the Second Circuit concluded that the value of the term "lodestar" as a metaphor "has deteriorated to the point of unhelpfulness," and consequently "This opinion abandons its use," substituting therefor the term "presumptively reasonable fee" comprised of a number of case-specific variables, an approach the Second Circuit restated and applied in *Simmons v. New York City Transit Authority*, 575 F.3d 170, 174 (2d Cir. 2009), cited by the Defendant at bar.  However, neither *Arbor Hill* nor *Simmons* cites or questions

28

*Quaratino*, and the factors listed in those cases do not include the amount recovered in litigation as the principal yardstick by which a plaintiff's fee must be measured and limited, as required by Judge Martin's discredited "billing judgment" approach.  I decline to employ that approach in this case. It is a distinction without a difference that *Quaratino* involved a civil rights case and this case is an ERISA case.  In a real sense, ERISA's remedial provisions define and protect the "civil rights" of disability plan beneficiaries like Paige Fairbaugh, who require all the protection they can get in a world seemingly populated by numerous insurance companies who prefer not to pay benefits. Limiting the attorney's fees of successful ERISA plaintiffs to a portion of the amount recovered could encourage companies to think that the lower the amount at stake, the more outrageous their conduct can be without the risk of being held accountable at law.  That is not an appealing concept.

### D.      Conclusion on Attorney's Fee

Applying all the relevant factors to this case, either under traditional "lodestar" analysis or *Arbor Hill* "presumptively reasonable fee" analysis, I conclude as follows:

1.  The hourly rates charged for the Durant Firm attorneys who worked on the case are reasonable in amount.

2.  There is no unnecessary duplication of effort on the part of these attorneys or any other factor that would require or justify a reduction in the amount of attorneys' time for which compensation is sought.

3.  In consequence, the presumptively reasonable fee amount may be calculated by multiplying these rates by these amounts of time.

4.  The resulting fee will be reduced by 5% for the reasons stated in Part III.C.3. of this Ruling.

5.  The out-of-pocket expenses claimed as part of the attorney's fee are reasonable and are allowed.

## IV.   CONCLUSION

Defendant's Motion to Reconsider [Doc. 46] is DENIED insofar as it relates to LTD benefits and DENIED AS MOOT insofar as it relates to medical-insurance costs.  Plaintiff's Motion to Hold Defendant in Contempt [Doc. 52] is GRANTED.  Plaintiff's Motion for Her Attorney's Fees and Costs [Docs. 55, 70] is GRANTED IN  PART and DENIED IN PART.

Plaintiff is directed to file and serve a Supplemental and Final Judgment, consistent in all respects with this Ruling, on or before June 8, 2012.  Defendant may file and serve objections **as to form only** or before June 15, 2012. If objections are filed, Plaintiff may respond to them on or before June 22, 2012.

It is SO ORDERED.